UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PAUL CLARK,

    Plaintiff,

v.

TRC ENVIRONMENTAL CORP.,

    Defendant.

C09-1854-JCC

**ORDER**

This matter comes before the Court upon Defendant's motion for summary judgment. (Dkt. No. 45). In addition to Defendant's motion, the Court has also considered Plaintiff's response (Dkt. No. 53), Plaintiff's reply (Dkt. No. 56), and the parties' various supporting exhibits and declarations. Having therefore reviewed the relevant record and having concluded that oral argument is unnecessary, the Court hereby GRANTS the motion in part and DENIES the motion in part for the reasons explained below.

Also before the Court is Defendant's motion to exclude evidence. (Dkt. No. 58). The Court hereby DENIES the motion.

# I. BACKGROUND

This case sounds in allegations of wrongful termination. Plaintiff Paul Clark alleges that Defendant TRC Environmental Corporation terminated his employment because he refused to falsify air-quality data and because he insisted that the company protect his own medical privacy and the medical privacy of his fellow employees. (Clark Decl. *passim* (Dkt. No. 53-1)). Defendant acknowledges having terminated Plaintiff's employment, but argues that it did so for an altogether different reason than the reason alleged by Plaintiff. According to Defendant, Plaintiff's employment was terminated because Plaintiff "displayed increasingly aggressive and disruptive behavior in the workplace." (Motion 1 (Dkt. No. 45)).

## A.  Air-Quality Data

Plaintiff, who has worked in air-quality testing since 1982, started working for Defendant in August 2001. (Clark Decl. 2 (Dkt. No. 53-1)). He alleges that he witnessed falsification of air-quality data within a few years of beginning his term of employment with Defendant. Specifically, Plaintiff alleges that co-workers falsified air-quality data which was submitted to the coordinators of a pipeline project and that another co-worker falsified data which was submitted to a glass company. (*Id.* 2–3). According to Plaintiff, he reported each of these incidents to his supervisors. In each case, Plaintiff alleges, his supervisors failed to take any corrective action. (*Id.*).

Starting in January 2008, Plaintiff was charged with the responsibility of supervising the company's air-measurements group in the western United States. He immediately encountered what he considered to be irregularities in the group's practices. (Clark Decl. 3–7 (Dkt. No. 53-1)). Specifically, Plaintiff grew concerned that group members were manipulating gas-chromatography data in order to provide customers with passing results that were fraudulent. In June 2008, Plaintiff reported these concerns to several of his supervisors, including one of the two individuals who handles ethics complaints on behalf of the company. (*Id.* 7). Two weeks after reporting his concerns, Plaintiff was

removed from his position as group manager for the western United States and re-assigned to the post which he had held previously—manager of the company's northwest office. Plaintiff describes this transfer as a demotion. (*Id.* 8).

After he was transferred, Plaintiff persisted in his efforts to address what he considered to be ethical lapses by his employer. In September 2008, he sent a lengthy email message to Mr. Martin Dodd, Defendant's general counsel. In the message, Plaintiff described his concerns about Defendant's practice of falsifying air-quality data and its further practice of covering up its wrongdoing. (Clark Email Message (Dkt. No. 54-1 at 29–32)). Defendant responded to this message and to other expressions of Plaintiff's concern by launching an internal investigation, which was headed by Mr. Andrew Johnson, an in-house attorney. As the investigation proceeded, Plaintiff sent an email message to Mr. Johnson with the names of other individuals who may have information about Defendant's alleged misdeeds. Mr. Johnson responded by telling Plaintiff that he was to cease speaking with his fellow employees about the alleged irregularities. Mr. Johnson further stated that Plaintiff had violated the attorney-client privilege by communicating with other employees. (Johnson Email Message (Dkt. No. 54-1 at 34–39)). After receiving this email message, Plaintiff concluded that Mr. Johnson's investigation was launched in order to cover up problems, not to rectify them. (Clark Decl. 8–9 (Dkt. No. 53-1)).

The brewing conflict between Plaintiff and Defendant finally came to a head in mid-July 2009. Plaintiff alleges that his supervisor asked him to perform a trial air-quality test with an individual whom Plaintiff knew to have previously falsified air-quality data. (Clark Dec. 9 (Dkt. No. 53-1)). According to Plaintiff, he refused this request, and was then ordered by his supervisor to appear at an early-morning meeting on July 16, 2009 to address the issue. (*Id.*). At the meeting, company representatives gave Plaintiff the choice of quitting or being fired. Plaintiff refused to quit. His employment was therefore terminated. (*Id.* 9–10).

//

**B.     Medical Records**

Starting in late 2007, Plaintiff began to experience concerns about Defendant's procedures with respect to the medical privacy of employees. According to Plaintiff, he first became worried after he and three other employees failed to pass a routine drug pre-test.[1] As he and the other employees were driving to a medical facility for further testing, one employee received a telephone call from his supervisor asking why he had failed a drug test. (Clark Decl. 11 (Dkt. No. 53-1)). Because of this call, all four employees became concerned that their company maintained faulty medical-privacy policies. Plaintiff was chosen as their spokesman with company management. Plaintiff sent an email message to the company's human-resources department in September 2007, complaining that the company's actions had served to "spread [the employees'] names around the company as drug users." (Medical Email Message (Dkt. No. 54-1 at 36)). The email ends with a request that the human-resources representative remind company managers of "the need to keep any medical test results confidential." (*Id.*).

Just as the issues related to data falsification reached a climax in mid-2009, so too did the issues related to medical privacy. In June 2009, Plaintiff and other employees were asked to complete certain medical-history forms and return them to their managers. (Clark Decl. 12 (Dkt. No. 53-1)). In an email message to his supervisor, Plaintiff again expressed concern about his company's medical-privacy policies. (Second Medical Email Message (Dkt. No. 54-1 at 53–55)). The supervisor told Plaintiff that the matter had been referred to the company's legal department. The supervisor also implicitly told Plaintiff to focus on other matters and to ignore medical-privacy issues by telling him that "there is plenty of critical work that needs to be done," and asking whether he had followed up on a matter unrelated to his medical-privacy concerns. (*Id.*).

//

---

[1] According to Plaintiff, neither he nor the other three employees ever tested positive for drugs. Instead, they failed to pass an "indicator cup test," which in turn triggered a *second* test of their urine samples. All four employees passed the second drug test without a problem. (Clark Decl. 11 (Dkt. No. 53-1)).

**C.     Defendant's Account**

Defendant insists that all of Plaintiff's concerns about data falsification and medical privacy were seriously considered and appropriately resolved. Defendant further insists that Plaintiff's employment was terminated for a single reason—because of Plaintiff's "aggressive and disruptive behavior" and his "insubordinate attitude." (Motion 1, 11 (Dkt. No. 45)).

Shortly after Plaintiff first reported his concerns about potential data falsification, company management sent an email message to all air-measurement staff reminding employees of the importance of data integrity. The email message contained excerpts from the company's quality-management plan dealing with ethics and integrity. In part, the relevant section reminded employees that "altering or fabricating test results is strictly prohibited," and that "professional care must be used to ensure that the processing or manipulation of field data . . . preserves the integrity of all data." (Ethics Email Message (Dkt. No. 46-1 at 20–21)). Defendant also takes issue with Plaintiff's characterization of the internal company investigation headed by Mr. Andrew Johnson. Defendant argues that Plaintiff's description of Mr. Johnson's internal investigation as a "cover-up" amounts to nothing more than a "bald allegation." (Reply 8 (Dkt. No. 56)).

Defendant also insists that Plaintiff's employment was terminated because of his poor performance, and not out of any retaliatory motive. According to Defendant, Plaintiff took personal affront to legitimate business decisions. For example, Defendant describes the decision to re-assign Plaintiff to the company's northwest office as a "reorganization decision based on budgeting and efficiency issues." (Motion 7 (Dkt. No. 45)). Defendant notes that Plaintiff received the same salary and benefits after his re-transfer to the company's northwest office that he had received while working as the company's group manager for the western United States. Finally, Defendant also notes that a company supervisor sent an explanatory email message to all people affected by the decision which expressly disclaimed any intention to punish Plaintiff. (*Id.*).

Defendant argues that Plaintiff ignored these realities, and that he instead interpreted legitimate economic decisions as personal attacks upon him. Defendant further argues that Plaintiff responded by behaving in an insubordinate manner. In support of this argument, Defendant offers the declaration of an employee whom Plaintiff supervised. In relevant part, the employee describes comportment which she characterizes as "continued mismanagement, poor communication, disruptive behavior, unwarranted finger-pointing, and flat-out dishonesty." (Aasland Decl. 3 (Dkt. No. 48)). The employee's problems with Plaintiff culminated in June 2009, when she composed a letter to company supervisors describing her complaints in full. In the letter, she alleges, *inter alia*, that Plaintiff expressly forbade her from communicating with certain company supervisors, and that Plaintiff himself consistently ignored direct orders from company supervisors. (Aasland Letter (DKt. No. 48-1)).

## II.  LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure states that this Court should render summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Under the terms of Rule 56, a defendant may move for summary judgment by alleging that the plaintiff cannot produce evidence to support an essential element of the plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial." *Id.* A plaintiff overcomes such a motion by producing some quantum of evidence with respect to the disputed element. *Id.* at 324. In attempting to meet his or her burden, the plaintiff cannot rely on the allegations contained in the complaint itself, but must instead produce evidence that could be reduced to a form which is admissible at trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If this Court wrongly enters summary judgment against a plaintiff, it has invaded the province of the jury and deprived the plaintiff of his Seventh Amendment right to a jury trial. *Cox v. English-American Underwriters*, 245 F.2d 330, 333 (9th Cir. 1957). In some circumstances, summary judgment is improper even when the material facts are undisputed: "Summary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts." *United States v. Perry*, 431 F.2d 1020, 1022 (9th Cir. 1970).

## III. RELEVANT LAW

In order to prevail on a claim for wrongful employment termination in violation of public policy, a plaintiff must demonstrate (1) the existence of a clear public policy; (2) that discouraging the conduct in which he or she engaged would jeopardize the public policy; (3) that his or her public-policy-based conduct was the cause of the employment termination. *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377, 382 (Wash. 1996). If a plaintiff demonstrates all three of the elements, a defendant can nonetheless prevail if the defendant successfully demonstrates "an overriding justification for the dismissal." *Id.*

The existence of a "clear public policy" is a pure question of law, reserved to the Court. *Korslund v. DynCorp Tri-Cities Services, Inc.*, 125 P.3d 119, 126 (Wash. 2005). In order to resolve the inquiry, this Court generally confines its analysis to expressions of popular will, considering only "whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme." *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984). While Washington State law is clear that "[p]rior judicial decisions may also establish relevant public policy," it is equally clear that "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." *Id.* (emphasis omitted).

//

//

In order to demonstrate that the termination of his or her employment "jeopardizes a clear public policy," a plaintiff must show that he or she "engaged in particular conduct, and that the conduct *directly relates* to the public policy, or was *necessary* for the effective enforcement of the public policy." *Gardner*, 913 P.2d at 945 (emphasis in original). To meet this burden, a plaintiff must demonstrate that "other means for promoting the policy are inadequate," and that "the threat of dismissal will discourage others from engaging in the desirable conduct." *Id.* (internal markings omitted).

Finally, in order to establish that the public-policy-based conduct was the cause of the termination, a plaintiff must demonstrate the existence of "a nexus between his discharge and the alleged public-policy violations." *Havens v. C&D Plastics, Inc.*, 876 P.2d 435, 446 (Wash. 1994). A plaintiff cannot satisfy this burden merely by establishing that he or she was discharged after having engaged in behavior that implicates public-policy concerns. *Campbell v. Lockheed Shipping Co.*, 785 P.2d 459, 461 (Wash. App. 1990) ("The timing of the discharge alone . . . is insufficient evidence of improper motive[.]"). It is possible, however, for a plaintiff to satisfy his or her burden with respect to the element of causation by relying exclusively on circumstantial evidence. As the Washington State Supreme Court has explained: "Proof of the employer's motivation may be difficult for the employee to obtain. Ordinarily, the *prima facie* case must, in the nature of things, be shown by circumstantial evidence, since the employer is not apt to announce retaliation as his motive." *Wilmot v. Kaiser Aluminum & Chemical Corp.*, 821 P.2d 18, 30 (Wash. 1991) (internal markings omitted).

Even if a plaintiff manages to establish all three elements of the tort for wrongful termination in violation of public policy, a defendant can nonetheless prevail. A defendant prevails under such circumstances if he or she demonstrates "an overriding reason for terminating the employee despite the employee's public-policy-linked conduct." *Gardner*, 913 P.2d at 385. This affirmative defense "acknowledges that some public policies, even if clearly mandated, are not strong enough to warrant interfering with employers' personnel management." *Id.*

## IV. PUBLIC POLICY

Plaintiff argues that Defendant violated two separate public policies when it terminated his employment. Plaintiff argues that Defendant's alleged conduct violated the public-policy goals of the United States Clean Air Act of 1963 and the Washington State Health-Care Information Act of 1991.

### A. Clean Air Act of 1963

Having found that air pollution creates "mounting dangers to the public health and welfare," Congress passed the Clean Air Act in order to "protect the nation's air resources so as to promote the public health and welfare and productive capacity of its population." Clean Air Act of 1963, Pub. L. 88-206, 77 Stat. 392–401 (1963), *codified in relevant part at* 42 U.S.C. §§ 7401 *et seq.*

The Clean Air Act contains a comprehensive enforcement scheme that relies upon both public and private actors. The Act generally authorizes the administrator of the Environmental Protection Agency to promulgate and enforce necessary regulations, 42 U.S.C. § 7601, and expressly authorizes her to require polluting companies to sample emissions and to maintain records of such emissions. *Id.* § 7414. The Act also contains a provision which forbids employers from discharging or otherwise disciplining employees for commencing a proceeding that arises under the Act, for testifying in such a proceeding, or for otherwise assisting in such a proceeding. *Id.* § 7622(a)(1)–(3). In the event that an employer unlawfully disciplines an employee who attempts to participate in such a proceeding, the Act provides that the employee may file a complaint with the Secretary of Labor within thirty days after the unlawful discipline occurs. *Id.* § 7622(b)(1).

### B. Washington State Health-Care Information Act

Having found that "[h]ealth-care information is personal and sensitive information," and that improper use or release of such information "may do significant harm to a patient's interest in privacy, health care, or other interests," the Washington State Legislature enacted the Uniform Health-Care Information Act in 1991, *codified at* WASH. REV. CODE § 70.02.005 *et seq.* The Act, which governs the

terms under which health-care providers can disclose confidential patient information, creates a general rule that "an agent and employee of a health-care provider may not disclose health-care information about a patient to any other person with the patient's written authorization." WASH. REV. CODE § 70.02.020.

## V. DISCUSSION

Because Plaintiff has demonstrated that the United States Government has a clear public policy of protecting employees who take steps to maintain accurate air-quality records against reprisals from their employers who seek to falsify such records, and because Plaintiff has submitted some evidence that Defendant terminated his employment because he actually took such steps, his claim sounding in allegations of air-data falsification survives. With respect to this first claim, Defendant's motion for summary judgment is therefore denied.

Because Plaintiff has failed to demonstrate that Washington State has an equally clear public policy requiring employers to maintain the health records of their employees in a confidential manner, his claim sounding in allegations of medical-privacy violations fails. On this second claim, Defendant's motion for summary judgment is therefore granted.

### A. Public Policy

The Clean Air Act of 1963 contains a variety of provisions demonstrating a clear public policy of protecting whistleblower employees against reprisal from their employers. The Act requires that certain polluters sample their emissions and that they maintain records of such emission-sampling. *See* 42 U.S.C. § 7414. The Act also expressly forbids an employer from terminating the employment of an individual who participates in any proceeding that arises under the terms of the Act. *See id.* § 7622(a)(1)–(3). These provisions of law demonstrate a clear public policy of requiring polluting companies to monitor their own pollution levels by using air-quality-testing companies like Defendant TRC Environmental Corporation, and to protect the integrity of the data produced by protecting

whistleblowers who allege that companies are falsifying data. Defendant allegedly falsified air-quality data and terminated the employment of an individual who insisted on data integrity. Defendant's alleged conduct therefore "contravene[d] the letter or purpose" of the Clean Air Act, which means that the alleged conduct violated a clear public policy. *See Thompson*, 685 P.2d at 1089.

Washington State's Uniform Health-Care Information Act of 1991, on the other hand, nowhere discusses the obligations that *employers* have with respect to the medical privacy of employees. The Act is focused exclusively on "agents and employees of *health-care providers.*" *See* WASH. REV. CODE § 70.02.020 (emphasis added). The Act defines health-care provider to mean "a person who is licensed, certified, registered, or otherwise authorized by the law of this state to provide health care in the ordinary course of business or practice of a profession." *See id.* § 70.02.010(9). Under the plain terms of the Act, therefore, employers are not subject to its strictures. Without a clear expression of popular will governing the treatment of medical information by *employers*, this Court heeds the Washington State Supreme Court's injunction that "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." *See Thompson,* 685 P.2d at 1089. The Court therefore finds that Plaintiff has failed to establish a clear public policy protecting employees who complain about their employers' medical-privacy policies.

**B.     Jeopardy**

Plaintiff has successfully demonstrated that Defendant's alleged conduct would jeopardize the efficacy of the nation's clean-air policies. If an air-testing company could require all its employees to face the Hobson's choice of either participating in the falsification of air-quality data or losing their jobs, many employees would place their own well-being above whatever qualms they experience about data falsification. The Clean Air Act of 1963 requires, however, that *accurate* air-quality data be provided to the appropriate regulatory authorities. *See* 42 U.S.C. § 7414. Because Defendant's alleged conduct would require employees to choose between supplying *inaccurate* information and losing their

1 jobs, the allegedly wrongful termination would "discourage others from engaging in the desirable
2 conduct," and thereby jeopardize the nation's clean-air policies. *See Gardner*, 913 P.2d at 945. Plaintiff
3 has therefore submitted evidence tending to indicate that under the circumstances of this case,
4 employment protections for whistleblowers is "necessary for the effective enforcement of public
5 policy." *See id.* (internal emphasis removed).

**C.     Cause**

Finally, Plaintiff has also presented evidence which tends to indicate that his employment was terminated because of behavior which triggers public-policy protections. Approximately six months after Plaintiff was charged with the responsibility of supervising Defendant's air-management group in the United States, and only two weeks after he reported ethical concerns to management, Defendant removed Plaintiff from his new position and re-assigned him to the company's northwest office. (*See* Clark Decl. 7–8)). Plaintiff has also submitted evidence from which a jury could conclude that Defendant's internal investigator Mr. Andrew Johnson was more concerned about silencing Plaintiff's criticisms than he was about rectifying irregularities. This evidence includes an email message from Mr. Johnson to Plaintiff expressly warning Plaintiff to refrain from discussing his concerns with other employees. (*See* Johnson Email Message (Dkt. No. 54-1 at 34–39)). Some of this evidence is circumstantial. Plaintiff's case nonetheless survives the motion for summary judgment. As the State Supreme Court has stated: "Ordinarily, the *prima facie* case must, in the nature of things, be shown by circumstantial evidence, since the employer is not apt to announce retaliation as his motive." *See Wilmot*, 821 P.2d at 30.

**D.     Overriding Reason**

Defendant argues that this Court should dismiss Plaintiff's claim because Defendant "has provided an overriding justification for the termination decision." (*See* Motion 20 (Dkt. No. 45)). Defendant argues that Plaintiff's employment was terminated because he behaved in an inappropriate

and insubordinate manner, and not because he expressed concerns about air-data falsification. (*See id.*). Defendant offers substantial evidence to support its position, including the testimony of one of Plaintiff's subordinates, who describes "continued mismanagement, poor communication, disruptive behavior, unwarranted finger-pointing, and flat-out dishonesty." (*See* Aasland Decl. 3 (Dkt. No. 48)).

Defendant shall have the opportunity to present this argument and supporting evidence to the jury. If the jury believes Defendant's account, Defendant shall prevail. At this stage of the proceedings, however, judgment for Defendant is improper. Because different inferences can arise from the facts of this case, and because "[s]ummary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts," *see Perry*, 431 F.2d at 1022, this Court must deny Defendant's motion for summary judgment. If this Court were to do otherwise, it would be invading the province of the jury and thereby depriving the plaintiff of his Seventh Amendment right to a jury trial. *See Cox*, 245 F.2d at 333.

## VI. CONCLUSION

For the aforementioned reasons, the Court hereby GRANTS Defendant's motion for summary judgment in part and DENIES the motion in part. (Dkt. No. 45). The Court therefore DISMISSES Plaintiff's claims which sound in allegations of medical-privacy violations.

Because Defendant has failed to demonstrate that it would suffer prejudice if this Court were to admit Plaintiff's proffered evidence, the Court DENIES Defendant's motion to exclude evidence.

SO ORDERED this 19th day of August, 2011.

JOHN C. COUGHENOUR
United States District Judge